**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SPINIELLO COMPANIES, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 04-11933-NMG |
| ) | |
| BRICO INDUSTRIES, INC., ) | |
| ) | |
|     Defendant. ) | |

**PLAINTIFF SPINIELLO COMPANIES' OPPOSITION TO DEFENDANT BRICO
INDUSTRIES, INC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff Spiniello Companies ("Spiniello") hereby opposes the Defendant Brico Industries, Inc.'s ("Brico") Motion for Summary Judgment.  Brico has moved for summary judgment on the grounds that (i) no privity of contract exists between Spiniello and Brico for the purchase of the products at issue, (ii) Spiniello's tort-based claims for misrepresentation and negligence are barred by the statute of limitations, (iii) Spiniello's tort-based claims for misrepresentation and negligence are barred by the economic loss doctrine, (iv) Spiniello is barred from asserting breach of warranty absent privity of contract, and (v) that no evidence establishing violations of M.G.L. c. 93A by Brico have been demonstrated.  Spiniello waives, stipulates and agrees to the dismissal of its tort-based Counts II (Misrepresentation) and III (Negligent Design).

Brico has failed to demonstrate undisputed fact demonstrating that no privity of contract exists and accordingly, Brico's motion for summary judgment as to Counts I (Breach of Contract) and IV (Breach of Warranty) must be denied.  The evidence presented herein and in

the Affidavits filed herewith demonstrates unequivocally that the parties acted at all times with recognition that the agreement for the provision of Brico's products was between Spiniello and Brico. Similarly, Brico has failed to establish any undisputed evidence which entitles it to summary judgment on Count V (M.G.L. c. 93A) and its motion with respect to this count must also be denied. For the reasons set forth below and in the Affidavit of Jose Collazo ("Collazo Aff.") and the Affidavit of Jeremy Blackowicz, Esq. ("Blackowicz Aff.") filed herewith, Brico's motion for summary judgment on Counts I (breach of contract), IV (breach of warranty) and V (M.G.L. c. 93A) must be denied.

## II.    FACTUAL AND PROCEDURAL HISTORY

This action arises out of the construction and rehabilitation of a portion the Weston Aqueduct Supply Mains 1 and 2 (the "Project"). See Complaint at ¶6; Collazo Aff. at ¶ 4. After public bidding, Spiniello entered into a general contract with the Massachusetts Water Resources Authority ("MWRA") to perform the work at the Project. Collazo Aff. at ¶ 5. Spiniello's work on the Project involved cleaning and lining of water pipes, which included the provision of internal pipe-joint seals ("inner seals") and external pipe-joint seals ("external couplings") on the joints of the forty-eight and sixty-inch water main pipes. Collazo Aff. at ¶ 6.

The Project specifications listed three potential suppliers for the inner seals, one of which was Brico. See Specification § 02776, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit A. The Project specifications further set forth performance and testing requirements for the inner seals. See Id. "Internal pipe-joint seals shall create a water-tight seal capable of withstanding a pressure of 200 psi." Id. at 02776-2 "Internal pipe-joint seals shall be designed for installing on pit cast-iron and steel pipes, and have a working pressure rating of 200 psi." Id. at 02776-5. The Specifications require that "[i]nitially, a minimum of 5% of the seals

2

installed shall be field tested to a minimum of 5 psi and in accordance with the manufacturer's recommendations. Additional testing will be based on the failure rate of the seals tested." Id. at 02776-9. Brico's representatives were present at pre-bid meetings held by the MWRA and its engineer Camp, Dresser and McKee ("CDM"). See Deposition of Robert J. Card, September 28, 2006 at pp. 82-83, a true and accurate copy of which is attached to the Blackowicz Aff. as Exhibit 1. Brico never raised any questions or concerns about the testing and performance requirements for the inner seals at the pre-bid meeting or in any pre-bid correspondence. See id. Brico was fully informed as to the Project requirements for inner seals and external couplings, including the testing requirements. See Deposition of Robert J. Card, dated September 28, 2006 at pp. 45-46, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 1.

Brico and its sales representatives contacted Spiniello regarding the supply of the inner seals and external couplings on numerous occasions, prior to and after Spiniello's submittal of its bid to the MWRA. Brico's representatives represented that the Brico seals would perform in accordance with the requirements and specifications for the Project. Collazo Aff. at ¶ 8. Prior to Spiniello's bid submittal, Brico and its sales representatives represented that Brico had worked closely with the MWRA and the Project engineer and was intimately familiar with the Project needs and that its product was the favored inner seal and would meet all of the Project requirements. Collazo Aff. at ¶ 9. Brico issued a Quotation to Spiniello for the provision of Brico's products to the Project, referencing the Project and specifications. See December 20, 1999 Quotation, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit B. Spiniello relied upon Brico's representations and incorporated the costs for Brico's products in its bid to the MWRA for the Project. Collazo Aff. at ¶ 11.

After award of the Project, and in reliance on Brico's representations that its products would meet the Project specifications, on or about March 7, 2000, Spiniello submitted purchase order No. 51566 to Brico for internal pipe-joint seals and external couplings on the Project. Collazo Aff. at ¶ 12; see also March 7, 2000 Purchase Order, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit C.  Brico revised certain terms of Spiniello's purchase order, striking certain terms and adding finance charges and its president, Don Bridges accepted and returned Spiniello's proposed purchase order.  See id.  Brico issued a confirmation of the purchase and agreement between Spiniello and Brico on or about March 27, 2000.  See March 27, 2000 Purchase order Confirmation, a true and accurate copy of which is attached to the Collazo Affidavit at Exhibit D.

On or about March 31, 2000, Brico submitted its calculation, engineering and shop drawings to Spiniello, incorporating the Project Specifications and requirements, for approval by the Project Engineer, which approved the Brico Seals on or about May 10, 2000.  See Submittal dated March 31, 2000, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit E.  As Brico noted, the Submittal for the Spiniello Project is similar to a submittal approved by CDM for a prior project on the same pipeline.  See id.  The Brico products were not off-the-shelf, stock items, but were manufactured specifically for Spiniello for use at the project and incorporating the Project Specifications.  See Deposition of Thomas Port, dated September 28, 2006 at pp. 60-61, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 2.  As part of its submittal, Brico detailed its proposed testing procedures, which provided, in pertinent part, as follows:

1. Proof-of-Design Testing…   Five (5) psi air pressure shall be introduced through a test valve in the seal.  The pressure shall be sustained while soap and water is

applied to the outer edge of the seal between the seal and pipe wall. There shall be no evidence of leaks.

3. Field Testing. The contractor shall test the installed seals at the same rate as the manufacturer's lot testing… Five (5) psi of air pressure shall be introduced through the test valve in the seal. There shall be no evidence of leaks between the seal and the pipe.

See Exhibit E to the Collazo Aff. CDM did not accept Brico's proposed field testing procedures, referring back to the Specifications requiring field testing and selection of seals to be field tested, which provided for a different selection process for testing the installed seals. See id. Brico's product literature touts its ability to field test with a standard installation test pressure of 5 psi. See id.

At the time of bidding, Spiniello intended to utilize Iron Construction Co., Inc. as the subcontractor to purchase and install the inner seals. See Collazo Aff. at ¶ 16. After award of the Project, Iron Construction Co., Inc. was unable to perform the work and Spiniello began the process of entering into the necessary contracts itself for the provision of the inner seals and external couplings. See Collazo Aff. at ¶ 17. Spiniello was subsequently permitted by the MWRA and CDM to substitute ODF Contracting Co. Inc. ("ODF") as subcontractor for the inner seals. See Collazo Aff. at ¶ 19. It was Spiniello's intent that ODF would satisfy Spiniello's requirements for minority business participation in the Project.[1] See Collazo Aff. at ¶ 20.

After Spiniello had entered into the purchase order with Brico, at CDM's request and in order to meet minority business participation requirements, it was recommended that Spiniello route its purchase of the inner seals through its installation subcontractor, ODF Contracting, Inc.

---

[1] ODF breached its subcontract with Spiniello, abandoning the Project and ceasing performance. See Collazo Aff. at ¶ 20. Spiniello received a waiver from the MWRA for its minority business enterprise requirements as a result of ODF's abandonment. See id.

Collazo Aff. at ¶ 21.  Shortly after entering into the subcontract with ODF, Spiniello understood

that ODF was beginning to experience financial difficulties.  Collazo Aff. at ¶ 22.  It was

Spiniello's intent for ODF to take-over the purchasing of the inner seals and couplings.  See

Collazo Aff. at ¶ 23.  While ODF ultimately submitted a purchase order dated June 20, 2000 to

Brico for the inner seals, Spiniello understood that Brico never accepted or acted upon ODF's

purchase order.  See Collazo Aff. at ¶ 24.  There is no signature, indicia of acceptance or

confirmation that Brico ever accepted ODF's purchase order.  See Exhibit 5 to the Federico

Affidavit; contrast Exhibits C and D to the Collazo Aff.  Brico continued to deal with Spiniello

for the purchasing of the inner seals and external couplings, shipping products to Spiniello and

issuing invoices to Spiniello and corresponding with Spiniello regarding cancellation of any

portion of the purchase order.  See Collazo Aff. at ¶ 25.  Spiniello continued to deal directly with

Brico regarding the purchasing, shipment, problems and cancellation relating to the Brico inner

seals and external couplings.  See Collazo Aff. at 26.  Spiniello never transferred its contract

with Brico to ODF and Spiniello never routed its purchases of Brico products through ODF.  See

Collazo Aff. at ¶ 27.  Brico never referenced the ODF purchase order number ODF486-1 on any

correspondence regarding the project or its provision of products to the Project, instead always

referencing the purchase order number from Spiniello 51566.  ODF never billed Spiniello for the

provision of inner seals, charging Spiniello for labor only.  See Collazo Aff. at ¶ 27.

The purchase order agreement between Spiniello and Brico required Brico to supply

approximately 2000 inner seals for a forty-eight inch diameter pipe and approximately 1060

Seals for sixty inch diameter pipe for a total price of $808,220.00.  See Exhibit C to the Collazo

Aff.  Pursuant to the agreement with Spiniello, Brico manufactured and delivered a portion of the

inner seals to the Project.  Notwithstanding ODF's purported Purchase Order, the shipment and

6

freight documents from Brico, dated July 20, 2000 and August 4, 2000 clearly show that the inner seals were sold and shipped to Spiniello, referencing Spiniello's Purchase Order number 51566.  See Shipping documents, true and accurate copies of which are attached to the Collazo Aff. as Exhibit F.

On or about July 24, 2000, Spiniello and ODF began the installation of the Brico inner seals on the sixty inch pipes at the Project in accordance with Brico's installation procedures. See Complaint at ¶ 19; Collazo Aff. at ¶ 29.  The installation of inner seals on the sixty inch pipes was required by the MWRA to be completed on or before October 3, 2000.  Collazo Aff. at ¶ 30.

Brico provided a representative at the Project site, William Haines, on July 24, 2000 to supervise and assist Spiniello and ODF with the initial installation of Brico inner seals.  See Resident Engineer's Daily report dated July 24, 2000, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit G.  During the course of the sixty inch pipe inner seal installation, Spiniello and ODF experienced problems with Brico's inner seals; with 29 of the 35 seals installed failing the required pressure testing.  See Exhibit G to the Collazo Aff.; see also See July 27, 2000 letter from Spiniello to Brico, attached to the Card Aff. as Exhibit 1.

Brico's installation procedures, included in the March 31, 2000 submittal detail the testing procedure for the inner seals after installation in the field:

"To air test (if optional air test valve was selected) – put approximately 5-6 p.s.i. into air test fixture.  With a spray bottle of soapy water spray the edges of the sleeve to check for air leaks"

See Exhibit E to the Collazo Aff.  Spiniello and CDM's engineer tested the inner seals in accordance with Brico's installation guidelines, introducing 5 psi of air pressure and spraying the

7

edges of the seal looking for bubbles indicative of air leaks.  <u>See</u> Resident Engineer's Daily

reports dated July 25 and July 26, 2000, true and accurate copies of which are attached to the

Collazo Aff. as <u>Exhibit H</u>; <u>see also</u> Collazo Aff. at ¶ 33.  This is a standard and common means

in the industry to test installed inner seals.  <u>See</u> Collazo Aff. at ¶ 33.  Spiniello witnessed that the

resident engineer failed those seals in which bubbles were escaping from between the seals and

the pipe, which such bubbles indicate an air leak.  <u>See</u> Collazo Aff. at ¶ 33.

      In response to Spiniello's letter, Brico responded and sent representatives to inspect the

inner seal failures on August 7 and 8, 2000.  <u>See</u> Resident Engineer's Daily reports dated July

31, August 1 and August 7, 2000, true and accurate copies of which are attached to the Collazo

Aff. as <u>Exhibit I</u>; <u>see also</u> See August 9, 2000 memorandum from Brico to Spiniello, a true and

accurate copy of which is attached to the Collazo Aff. as <u>Exhibit J</u>.  Brico's representative

inspected the Seals and installation thereof and reported that the seal installation were classified

into five (5) groups: (1) those that install and pass the testing; (2) inner seals that cannot install

over a taper near the pipe joint because the metal retaining bands "walk-off" the rubber sleeve;

(3) seals that have a manufacturing defect; (4) joints where there was an error in measurement;

and (5) joints that were not properly cleaned.  <u>See</u> <u>Exhibit J</u> to the Collazo Aff.  It was suggested

to Spiniello that a wider inner seal may correct the problems experienced at the tapered joints.

<u>See</u> Deposition of Thomas Port, dated September 28, 2006 at p. 98, a true and accurate copy of

which is attached to the Blackowicz Affidavit as <u>Exhibit 2</u>.

      Spiniello, Brico and CDM's resident engineer also noted that some of the seals contained

what appeared to be manufacturing defects, where the rubber seal was splitting or had holes in

the vulcanized joint where the rubber seal was joined.  <u>See</u> Resident Engineer's Daily reports

dated October 19, 2000 and January 25, 2001, true and accurate copies of which are attached to

8

the Collazo Aff. as Exhibit K; see also Exhibit J to the Collazo Aff; see also See Deposition of Thomas Port, dated September 28, 2006 at pp. 110-111, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 2.

On or about August 8, 2000, Spiniello hired a third-party consultant to review the inner seals and their installation. See Collazo Aff. at ¶ 37; see also Resident Engineer's Daily report dated August 23, 2000, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit L. It was discovered that a portion of the sixty inch pipes contained beveled or tapered ends and the Brico inner seals failed to meet the required sealing properties. See Collazo Aff. at ¶ 39; see also Jason Consultants Report dated August 30, 2000, a true and accurate copy of which if attached to the Collazo Aff. as Exhibit M. On or about August 23, 2000, Spiniello's consultant performed a comparison test between the Brico inner seal and another of the listed products from the specifications, with representatives from Brico present. See Exhibits L and M to the Collazo Aff. The Brico inner seal failed while the competitors' seal successfully passed the required testing at the very same joint. See August 28, 2000 letter from Spiniello to Brico, a copy of which is attached to the Card Aff. as Exhibit 2. Spiniello and its consultant identified certain concerns regarding the design of the Brico seal and its inability to meet the Project specification as well as what appeared to be manufacturing defects that impacted the inner seals' ability to function properly. See Collazo Aff. at ¶ 41. Brico agreed to modify the inner seals, creating a wider steel retention band. See Collazo Aff. at ¶ 42. Spiniello set a deadline for resolution of the issue or it would cancel the inner seal portion of the purchase orders it had with Brico. See Exhibit 2 to the Card Aff.

On or about September 6, 2000 Brico's representatives delivered the redesigned and modified inner seals to the Project and installed the modified inner seals on the sixty inch pipe.

9

See Resident Engineer's Daily Report, dated September 6, 2000, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit N. Brico's revised inner seal failed to pass the required testing and Brico's representatives concluded and communicated to Spiniello that its product could not meet the requirements for the Project. See id., see also Collazo Aff. at ¶ 44.

On or about September 11, 2000, pursuant to a request from Brico, Spiniello provided a preliminary cost impact and damages report resulting from the inner seal failure. See Exhibit 3 to the Card Aff. Brico had previously represented to Spiniello that it would reimburse Spiniello for extra installation, testing and delay costs it was incurring as a result of the failures of the Brico seals. See Collazo Aff. at ¶ 45. Spiniello also noted in the September 11, 2000 correspondence that Brico agreed to a mutual termination of the inner seal portion of the purchase order no. 51566 between Spiniello and Brico. See Exhibit 3 to the Card Aff. On or about September 15, 2000, Brico responded to Spiniello and agreed to a limited cancellation of purchase order 51566 for the sixty inch pipe inner seals. See September 15, 2000 letter from Brico to Spiniello, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit O. On September 20, 2000, Brico further responded to Spiniello and, *inter alia,* demanded payment from Spiniello for outstanding invoices under the purchase order 51566. See September 20, 2000 letter from Brico to Spiniello, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit P. The memorandum attached to the September 20, 2006 correspondence from Brico further references the Brico purchase order agreement 51566 with Spiniello. See id.

Spiniello's position in its October 3, 2000 letter was that, *inter alia*, Brico's seals did not perform as intended and specified and this constituted a breach of the agreement between Spiniello and Brico that permitted Spiniello to cancel the remaining shipments of all inner seal products. See October 3, 200 letter from Spiniello to Brico, a true and accurate copy of which is

attached to the Collazo Aff. as Exhibit Q.  Notably, Spiniello's October 3, letter affirms that the remainder of the purchase order between Spiniello and Brico (no. 51566) for Brico's supply of the external couplings would remain in effect.  See Id.

In later correspondence between Spiniello and Brico, Brico again referenced the outstanding invoices from Brico to Spiniello and demanded payment, referencing purchase order agreement 51566 between Spiniello and Brico.  See October 17, 2000 letter from Brico to Spiniello, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit R.

On or about October 25, 2000, Brico advised Spiniello that the Brico external couplings to be installed on the sixty inch pipes at the Project required the welding of additional metal restraints to avoid potential failure of the Brico external couplings at increased cost, damage and delay to Spiniello.  See October 25, 2000 letter from Brico to Spiniello, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit S.

In all prior information from Brico, there was never an indication that Spiniello would have to do extra work welding restraints on the pipes for the Brico external coupling to function. Collazo Aff. at ¶ 51.  See Deposition of Robert J. Card, September 28, 2006 at pp. 236-237, a true and accurate copy of which is attached to the Blackowicz Aff. as Exhibit 1.  Brico's plant manager testified that he was not aware of the use any additional supports to restrain the external couplings.  See Deposition of Thomas Port, September 28, 2006, at pp. 30, 148-149, a true and accurate copy of which is attached to the Blackowicz Aff. as Exhibit 2.  The specifications do not require or suggest that external transition couplings require welding additional restraints. Collazo Aff. at ¶ 52.  Brico's product fails to meet the specifications and agreement, wherein it required additional labor and materials to perform as required.  Collazo Aff. at ¶ 53.

11

III.    **ARGUMENT**

A.    **SUMMARY JUDGMENT STANDARD**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see also Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1121 (1st Cir. 1995). In ruling on a motion for summary judgment, the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party. Oliver v. Digital Equip. Corp., 846 F.2d 103,105 (1st Cir. 1988); Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 928 (1st Cir. 1983) (citing Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976)). Brico has not met its burden of proving its right to summary judgment in this matter; Brico's motion must therefore be denied.

B.    **PRIVITY OF CONTRACT EXISTS BETWEEN BRICO AND SPINIELLO**

Spiniello agrees that this matter involves the sale of goods under the Uniform Commercial Code. M.G.L. c. 106, § 2-102. Spiniello and Brico entered into a binding agreement for the provision of the inner seals and external couplings to the Project and thus, privity of contract exists between Spiniello and Brico. Spiniello issued a purchase order which was signed and accepted by Brico, confirmed by a written document from Brico to Spiniello titled Purchase Order Confirmation. See Exhibits C and D to the Collazo Aff. Subsequent dealings, invoices and correspondence between Spiniello and Brico consistently referenced this purchase order between Spiniello and Brico. Moreover, when the parties agreed to a partial cancellation of the purchase order relating to the inner seals, the agreement and purchase order

referenced was that between Spiniello and Brico.  See Exhibits O, P, Q and R to the Collazo

Aff.  Finally, when Brico's invoices were unpaid, it made demand on Spiniello.  See Invoices

from Brico to Spiniello dated July 20, 200, July 26, 2000 and July 29, 2000, true and accurate

copies of which are attached to the Collazo Aff as Exhibit T.  All of these actions demonstrate

and confirm that privity of contract exists between Brico and Spiniello and that Brico and

Spiniello did, in fact, contract for the purchase of the inner seals and external couplings.

Brico points to the purchase order issued by ODF numbered ODF-486-1, dated June 20,

2000, as evidence that no contract between Spiniello and Brico exists.  See Exhibit 5 to the

Federico Aff.  However, there is no evidence that Brico accepted, acknowledged or confirmed

ODF's June 20, 2000 purchase order; there simply is no evidence that a valid or binding

agreement was created.  Unlike Spiniello's Purchase Order, there was no signature by Brico

affirming the agreement and no Confirmatory Purchase Order issued by Brico to ODF.  See

Exhibit 5 to the Federico Affidavit; contrast Exhibits C and D to the Collazo Aff.  The

subsequent course of dealing on this Project all operated under the auspices of Spiniello's

Purchase Order, referencing the number of Spiniello's purchase order - 51566.  Similarly, there

is no evidence of shipment of goods to ODF for the Project.  While Spiniello may have intended

for ODF to take-over the purchasing of the inner seals and external couplings, no such action

ever occurred and Spiniello remained responsible and its purchase order agreement with Brico

remained in effect.  See Collazo Aff. at ¶¶ 23-27.  ODF never invoiced Spiniello for inner seals,

charging only for its labor costs.  See Collazo Aff. at ¶ 27.

Finally, in pursuing payment for the inner seals delivered to the Project, Brico never

looked to ODF, but instead pursued Spiniello for payment under Spiniello's purchase order

51566.  Thus, "the passing of title from the seller to the buyer for a price" never occurred

#610460

between Brico and ODF, and no "sale" was ever consummated.  See M.G.L. c. 106, § 2-106(1).

There was never any conduct between ODF and Brico that indicated or supported the existence

of a contract between those two parties.  See M.G.L. c. 106, § 2-204(1).

Contrary to Brico's assertions, the record is replete with evidence that shows and

supports the existence of a contract between Spiniello and Brico.  Brico's president signed the

Purchase Order with Spiniello, constituting acceptance of Spiniello's offer.  See M.G.L. c. 106,

§ 2-206; Lambert v. Kysar, 983 F.2d 1110, 115 (1st Cir. 1993)(holding that a signed order form

constitutes acceptance of the offer).  Similarly, Brico's provision of additional terms constituted

a conditional acceptance, which such terms were accepted by Spiniello, completing the

agreement.  See facsimile from Spiniello to Brico dated May 12, 2000, a true and accurate copy

of which is attached to the Collazo Aff. as Exhibit U; see also M.G.L. c. 106, 2-207(1).  Most

importantly, Brico issued invoices to Spiniello, dated July 20, 2000, July 26, 2000, July 29,

2000, and August 18, 2000 – all of which were issued after Brico's purported agreement with

ODF's, and all of which reference only Spiniello's purchase order number 51566.  See Invoices

attached to the Collazo Affidavit at Exhibit T.  All of these actions give rise to the inference and

evidence of a binding contract between Brico and Spiniello.  See Monaco v. Lombard Brothers,

Inc., 24 Mass. App. Ct. 941, 942 (1987)(holding that a contract may be implied from the

conduct of the parties and from the attendant circumstances).  The conduct of the parties clearly

establishes the existence of privity of contract between Spiniello and Brico.  M.G.L. c. 106, § 2-

207(3).

After the August 9, 2000 memorandum from Tom Port, suggesting the use of an extra

wide inner seal, Brico offered a quotation for such seals to Spiniello, not ODF, indicative of the

party it thought it had the purchasing agreement with.  See August 16, 2000 Quotation, a true

and accurate copy of which is attached to the Collazo Affidavit as <u>Exhibit V</u>.  After the partial

cancellation of the purchase order between Spiniello and Brico relating to the inner seals, the

evidence shows that Brico never recognized or sought to keep shipping inner seals under

Brico's purchase order with ODF.  Finally, ODF never billed Spiniello for any seals purchased

from Brico.  <u>See</u> Collazo Aff. at ¶ 27.

As detailed in the correspondence, the contract between Brico and Spiniello remained in

full force for the external couplings, with additional orders placed by Spiniello to Brico, being

processed under Spiniello's March 7, 2000 purchase order 51566.  <u>See</u> February 5, 2001

facsimile from Brico to Spiniello and February 13, 2001 letter from Brico's counsel to

Spiniello's counsel, true and accurate copies of which are attached to the Collazo Affidavit as

<u>Exhibits W and X</u>, respectively.  In fact, Spiniello made payment directly to Brico for materials

supplied by Brico to the Project.  <u>See</u> copy of Check No. 36996 attached to the Collazo

Affidavit at <u>Exhibit Y</u>.

The manifestations, expressions and conduct of Brico all validate the enforceability of

the written contract between Spiniello and Brico.  <u>See</u> <u>Pahlavi v. Palandijan</u>, 809 F.2d 938, 945

(1st Cir. 1987).  Brico's actions subsequent to executing and accepting the purchase order from

Spiniello clearly demonstrated that Brico understood it to be a binding agreement, which

remained in full force and effect despite ODF's separate purchase order.  <u>See</u> <u>Martion v. First

Nat'l Bank of Boston</u>, 361 Mass. 325, 332 (1972); <u>Bourgeois v. Hurley</u>, 8 Mass.App.Ct. 213,

215-216 (1979).  The presence of a signature entitles Spiniello to a presumption that Brico

assented and agreed to the purchase order and its legal effect.  <u>See</u> <u>Hull v. Attleboro Savings

Bank</u>, 33 Mass. App. Ct. 18, 24 (1992).  It is elemental that the existence of a contract can be

proven by reference to written correspondence which evidences the agreement between the

15

parties.  See Ozzola v. Musolino, 225 Mass. 512, 515 (1917).  Brico has presented no evidence

to the contrary that suggests that the agreement between Spiniello and Brico was not binding

and that the parties did not act in furtherance of their agreement.

Spiniello cancelled a portion of its purchase order as it related to the inner seals.  M.G.L.

c. 106, § 2-106.  This cancellation was based, in part, on Brico's own representatives admitting

to Spiniello's representatives that the inner seals were not suitable for application at the project.

See Collazo Aff. at ¶ 60.  A letter of rejection can serve as an acknowledgement of the existence

of a contract sufficient to make it enforceable.  Waltham Truck Equip. Corp. v. Massachusetts

Equip. Co., 7 Mass.App.Ct. 580, 583 (1979).  Brico agreed to the removal of the inner seals

from the purchase order agreement it had with Spiniello, evidence of the existence of the

contract between them.

Brico has failed to sustain its burden of proof to demonstrate that there was any lack of

privity of contract between it and Spiniello.  It is indubitable that Brico acted at all times in

furtherance of a contract with Spiniello and Brico's breach of its obligations entitles Spiniello to

seek remuneration for the damage suffered.  At the very least, a disputed question of fact exists

as to the ODF purchase order and the parties' intent and understanding, which defuses Brico's

summary judgment.  Accordingly, Brico's motion for summary judgment as to privity of

contract on Counts I and IV must be denied.

### C.    BRICO BREACHED ITS CONTRACT FOR THE PROVISION OF INNER SEALS AND EXTERNAL COUPLINGS

Brico failed to supply goods that were "conforming" to the contract in that they failed to

perform as understood, intended and specified.  M.G.L. c. 106, § 2-106.  Brico was fully

cognizant of the specifications and the testing requirements for the seals, when it suggested and

provided a quotation to Spiniello for the Project. See Deposition of Robert J. Card, dated September

#610460

28, 2006 at pp. 45-46, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 1.  Brico's quotation and the subsequent purchase order agreement between Spiniello and Brico acknowledges and incorporated the Project specifications, testing and performance requirements.  See Exhibits B and D to the Collazo Aff.  Spiniello installed and tested the inner seals in accordance with Brico's guidelines, using 5 psi of air; failure in the seal was noted by presence of bubbles in the soapy water sprayed along the edges of the seal.  See Exhibit E to the Collazo Aff.; see also Collazo Aff. at ¶ 33.  The resident engineer failed a large portion of the Brico seals.  See Collazo Aff. at ¶ 33.  Brico made subsequent attempts to meet the Project requirements and its products failed to pass the tests applied by CDM's resident engineer, which such test were performed in accordance with industry standards and Brico's own guidelines. See Resident Engineer's Daily Report, dated September 6, 2000, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit N; see also Collazo Aff. at ¶ 33.  The failure of the seals to meet the Project requirements is a breach of Brico's obligations to provide confirming goods, for which Spiniello is entitled to recover the damages suffered as a result of Brico's defective product.

Brico agreed to supply external couplings that would meet the Project specifications, as acknowledged in the quotation and subsequent purchase order agreement between the parties. See Exhibits B and D to the Collazo Aff.  Brico never indicated the need to install supplemental restraints for its products to operate, resulting in Spiniello incurring additional costs to weld restraining bars to the pipe prior to installing Brico's product.  See Deposition of Robert J. Card, September 28, 2006 at pp. 236-237, a true and accurate copy of which is attached to the Blackowicz Aff. as Exhibit 1.  Brico's failure to supply a product that met the project requirements as understood and agreed constitutes a breach of that agreement for which Spiniello is entitled to recover its extra costs.  CDM noted that Brico's external couplings were approved based on representations

17

that the product would meet the Project specifications and further raises concerns about erroneous calculations by Brico for the surge pressure requirements. See November 2, 2000 letter from CDM to Spiniello, a true and accurate copy of which is attached to the Collazo Aff. as Exhibit Z.

Brico has failed to present undisputed evidence that no breach of contract occurred and accordingly, its motion for summary judgment must be denied. At the very least, disputed questions of fact remain regarding the parties' mutual obligations and requirements for the products, such that summary judgment at this time is inappropriate. Brico's motion for summary judgment on Count I, breach of contract, must be denied.

### D.    SPINIELLO IS ENTITLED TO SEEK RELIEF FOR BREACH OF WARRANTY

Brico agreed to provide inner seals and external couplings that meet the performance and testing requirements of the contract and specifications, which such affirmation creates an express warranty. See M.G.L. c. 106, § 2-313. A manufacturer's sales representative's statements that the product would meet certain requirements may also create an express warranty. See Alcan Aluminum Corp. v. Carlton Aluminum of New England, Inc., 35 Mass. App.Ct. 161, 166-167 (1993), review denied, 416 mass. 1105. Brico's sales representatives presented the inner seal as the preferred product of CDM and the MWRA and that the inner seal would meet all of the project needs and work in all situations. See Collazo Aff. at ¶ 9. Brico's sales representatives made further representations that the inner seals were installed without problems in prior portions of the MWRA aqueduct pipeline. See id. At the very least, genuine issues of material fact exist with regard to the creation and breach of express warranties based upon Brico's sales representatives' statements, such that summary judgment must be denied. See Glyptal, Inc. v. Engelhard Corp., 801 F.Supp. 887 (D. Mass. 1992).

An express warranty is breached when a product fails to exhibit the properties, characteristics or qualities specifically attributed to it by its warrantor and therefore, fails to conform to the warrantor's representations.  See 35 Mass. Prac. § 6.92 (citations omitted). When reviewing a claim for breach of warranty, express or implied, the focus is on performance, or lack thereof, of the product in comparison to the standard or agreement for performance.  See Bell Sports v. Yarusso, 759 A.2d 582 (Del. 2000).  Brico's inner seals and external couplings failed to function as required and promised; the standard for performance and testing was a known and agreed-upon element of the purchase order agreement between the parties that was breached by Brico's defective products.

Brico's products further contain an implied warranty that the inner seals were fit for their intended purpose and would conform to the Project specifications and testing requirements.  See M.G.L. c. 106, § 2-314, 2-315.  Brico's representative testified that he reviewed the specifications for the Project and made a determination which Brico products would be suitable for the Project and issued quotations to interested bidder.  See Deposition of Robert J. Card, dated September 28, 2006 at pp. 45-46, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 1.  Thus, Brico utilized its skill and judgment to determine which of its products were suitable for the project and an implied warranty of fitness for a particular purpose was created.  M.G.L. c. 106, 2-315.  The Brico products were not off-the-shelf, stock items, but were manufactured specifically for Spiniello for use at the project and incorporating the Project Specifications.  See Deposition of Thomas Port, dated September 28, 2006 at pp. 60-61, a true and accurate copy of which is attached to the Blackowicz Affidavit as Exhibit 2.

Spiniello's claim for breach of warranty parallels the concept of the implied warranty in plans and specifications in a construction job; the party responsible for the design impliedly warrants that it is sufficient for the purposes intended.  See Alpert v. Commonwealth, 357 Mass.

19

306, 320 (1970); Richardson Electrical Co., Inc. v. Peter Francese & Son, Inc., 21 Mass.App.Ct. 47, 50-51 (1985)(there is implied in a set of construction plans and specifications a warranty that they are accurate as to descriptions of the kind of work and quantity required); see also United States v. Spearin, 248 U.S. 132 (1918). In this case, Brico was charged with the responsibility for designing the seal to meet the project specifications and testing requirements. The evidence has shown that Brico's seal consistently failed at joints where a competitor's product effectuated a seal. Brico's failure to meet its obligations of providing a conforming product constitutes a breach of its warranties to Spiniello.

Brico never excluded or modified the implied warranties for its goods. See M.G.L. c. 106, 2-315. The failure of a product resulting from defective design may form the basis for a breach of the implied warranty. See Kearney v. Philip Morris, Inc., 916 F.Supp. 61, 64 (D. Mass 1996). The fact that Brico's products may have been specified by the MWRA and CDM does not negate the implied warranty of merchantability. See Commonwealth v. Johnson Insulation, 425 Mass. 650, 655-56 (1997). The case of Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co., 25 Mass. App. Ct. 530 (1988) is inapposite as the failures of the Brico seal do not arise from MWRA or CDM's specifications, but the Brico inner seal's inability to pass the required performance and testing requirements which arise as a result of Brico's design, engineering and manufacture. See also id. Brico was fully informed that its product was required to pass certain tests per the specifications and agreed to supply products to meet those requirements; however, its product failed to perform as promised, due in no part to errors in CDM or MWRA's specifications. Brico custom made the inner seals and external couplings specifically for this Project and its unique requirements. The Brico products were not off-the-shelf, stock items, but were manufactured specifically for Spiniello for use at the project and incorporating the Project Specifications. See Exhibit E to the Collazo Aff.; Deposition of Thomas Port, dated September

28, 2006 at pp. 60-61, a true and accurate copy of which is attached to the Blackowicz Affidavit as

Exhibit 2.  Accordingly, the decision in Cumberland Farms, Inc. is inapplicable to the present

case and Brico's Motion for Summary Judgment on Count IV must be denied.

Brico's inner seals failed to meet the express testing requirements of the Specifications

and its external couplings failed to perform without modifications and measures contrary to

what was understood and agreed.  The failures of Brico's products violate the warranties that

such products would comply with the agreement, specification and Project needs and do not

perform their known and intended purpose.  Brico has failed to present undisputed evidence that

it did not breach its warranties and at the very least, disputed questions of fact remain

outstanding.  Accordingly, Brico's motion for summary judgment on Count IV must be denied.

E.    **BRICO HAS FAILED TO MEET ITS BURDEN TO SHOW
      UNDISPUTED FACTS ELIMINATING SPINIELLO'S M.G.L. C. 93A
      CLAIM**

In a M.G.L. c. 93A claim, the existence of unfair or deceptive acts ordinarily must be

determined from the circumstances of each claim. Marram v. Kobrick Offshore Fund, Ltd., 442

Mass. 43, 62 (2004); Spence v. Boston Edison Co ., 390 Mass. 604, 615- 616 (1983).  In order to

prevail on a M.G.L. c. 93A, § 11 claim, a claimant must prove that a person who is engaged in

trade or business committed an unfair or deceptive trade practice and that the claimant suffered a

loss of money or property as a result.  Bowers v. Baystate Technologies, Inc., 101 F.Supp.2d 53,

54 (2000); Alan Corp. v. International Surplus Lines Ins. Co., 823 F.Supp. 33, 43 (1993).  The

standard for determining whether conduct in a transaction between two businesses is unfair or

deceptive is whether such conduct reaches "a level of rascality that would raise an eyebrow of

someone inured to the rough and tumble of the world of commerce." Damon v. Sun Co., Inc., 87

F.3d 1467, 1483 (1st Cir.1996) (quoting Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498,

504 (1979)).  The Court must also decide whether "in the rough and tumble world of commerce

the manner and morals of the marketplace have been offended in a legally cognizable manner." See International Totalizing Systems, Inc. v. PepsiCo, Inc., 29 Mass.App.Ct. 424, 425 (Mass.App.Ct. 1990). Brico's entrance into a public construction contract providing for a strict schedule and liquidated damages, yet failure to supply confirming products is a violation of M.G.L. c. 93A, entitling Spiniello to seek multiple damages and attorney's fees in connection with any lawsuit. Misrepresentations made to induce the execution of a contract are "unfair and deceptive" acts under 93A. Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928 (1st Cir. 1985).

The basis for Spiniello's M.G.L. c. 93A claim against Brico also arises, in part, from Brico's promise to provide products that conformed to the Project specifications and testing requirements. In reliance on Brico's promise to provide conforming products, Spiniello utilized Brico's quotation in its bid and relied upon Brico's compliance with its obligations to meet the construction schedule. Furthermore, Spiniello has reason to believe that Brico was aware of problems with its seals experienced at prior projects with the MWRA and withheld such information from Spiniello. See Collazo Aff. at ¶ 62. Spiniello understands that, due to the difficulties and failures of Brico's products, The MWRA no longer permits their use in its pipelines. See Collazo Aff. at ¶ 63. Whether Brico's conduct was unfair or deceptive and in violation of M.G.L. c. 93A is a question of fact. Teitelbaum v. Hallmark Cards, inc., 25 Mass.App.Ct. 555, 562 (1988). As there are disputed facts relating to this claim, summary judgment on Count V is inappropriate and Brico's motion must be denied.

## IV.    CONCLUSION

Plaintiff Spiniello respectfully requests that this Court deny Brico's Motion for

Summary Judgment for the reasons set forth above.


Dated: October 19, 2006                    Respectfully submitted,

                                           **SPINIELLO COMPANIES**

                                           *By its attorneys,*


                                           _____/s/ Jeremy Blackowicz_____
                                           Charles E. Schaub, Jr., BBO #444920
                                           Jeremy Blackowicz, BBO #650945
                                           HINCKLEY, ALLEN & SNYDER, LLP
                                           28 State Street
                                           Boston, MA  02109-1775
                                           (617) 345-9000


## CERTIFICATE OF SERVICE

I, Jeremy Blackowicz, hereby certify that on this 19th day of October 2006, this document filed
through the ECF system will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-
registered participants.

Thomas C. Federico, Esq.
Morrison Mahoney, LLP
250 Summer Street
Boston, Massachusetts  02110


                                           _____/s/ Jeremy Blackowicz_____

23

#610460